Next case on our docket 2013-1196 IN RE WEINSTEIN Next case on our docket 2013-1196 IN RE WEINSTEIN Good morning, Your Honors. Excuse me. A little frog on my throat this morning. May it please the Court, my name is Robert Gallo. I'm appearing here today on behalf of the appellant, patent owner, Drs. Allen and Robert Weinstein. And the issue before this Court today is whether the evidence relied on by the Patent and Trial and Appeal Board is evidence that one skilled in the art would consider adequate and acceptable to support the conclusion of obviousness. We say no to that because we feel that the Board failed to consider the thinking of one of ordinary skilled in the art at the time of the invention, guided only by the prior art references and the then accepted wisdom in the field. In the central issue in the claims in this case concerns a combination nighttime dosage unit containing a sedating antihistamine and a stimulating decongestant that is in a dose that is attenuated as compared to the dose of the decongestant in the daytime dosage unit. The Board… At the time of the invention, it was pretty well known in the prior art, was it not, that decongestants are stimulants and antihistamines are sedatives? Yes, there's no denying that, Your Honor. Our subject of this appeal, which is patent 372, states that right in the patent. Right. What the Board and the examiner below had to rely on as the key reference was the Goodman-Gilman reference, which is a textbook, pharmacological textbook, and the section dealing with sedating antihistamines. Just based on that statement of what's known in the prior art and the fact that it's articulated in the patent, then isn't it obvious that if you're going to have a two-dosage medication that at nighttime you want to dose the antihistamines and during the daytime the stimulants? Why would you give stimulants to somebody who's about to go to sleep? In fact, there are studies that show that the combination with treating rhinitis, which is cold symptoms, is best achieved either with decongestant alone or decongestant antihistamine in order to clear up the sinuses and dry up the sinuses. Because the key to the invention is a combination, it's not just looking at knowledge per se, which is decongestants or stimulants, because you have to take into account the then accepted wisdom at the time in the field. And the wisdom at the time in the field, which is pointed out in the prior art that the examiner was submitting, is that the combination is a sedating combination. And they're trying to piece together this knowledge of, well, it's stimulating, and so there's a reason, there's the motivation to reduce the amount of stimulant in that nighttime dose. So why is it not obvious that you would reduce the dosage? Because you want to take advantage of the full benefit, the efficacy of the stimulant and the sedation when you're taking that medication. I guess I don't understand. One of these drugs makes you tired, the other makes you wired, right? And so if you're suddenly concerned, in the prior art of Bayh in particular, that the one that makes you wired is going to prevent you from falling asleep and have difficulty going to sleep. Well, then why wouldn't that motivate you to just decrease the amount of that drug that you're giving in your combination? I noticed you referred back to Bayh as a piece of prior art that talks about the decongestant, and they had some patients who complained about stimulation, being awake at night. In fact, their number was 25. But again, that's taking isolated pieces out of prior art. If you read by, there's, first of all, that data, when you look at how many patients were given either decongestant or decongestant with sedating antihistamine, you had 63 patients of just decongestant, and you had 56 with decongestant antihistamine for a total of 119 patients. Nowhere in Bayh do they really describe those 25. Who are they? All they say is it's 25 who take decongestant. They never say it's 25 who take the decongestant and the stimulant. But, okay, if I say, here, take a decongestant and a stimulant at night, and then there's prior art that says people who take a decongestant sometimes have trouble sleeping, why isn't that combined with Goodman, which says, look, if you want to reduce the side effects of something, just reduce the amount of drugs, why isn't that sort of an absolute prescription for, well, if people have trouble sleeping, let's just reduce that one a little bit? That would make sense if the thinking was there was a problem, but there was no problem. Everybody believed that the combination of a sedating antihistamine with a stimulating decongestant was a sedating combination, because even Goodman and Gilman had said, you know, if you want to offset the sedation… Doesn't Bayh show there's a problem? Doesn't Bayh say those very people taking both of them had trouble sleeping? No, no, but they're saying, and they're not saying that because they never really differentiate who's taking the combination and who isn't. In their data, the bulk of the complaints are coming from the single dose of decongestant alone. What does that mean? Are you saying, I don't remember Bayh as well as you do, but I guess I thought that there was reason that it could be interpreted that maybe some of the people who were taking both were also complaining? There was very few people who were complaining. Really, did she tell me where Bayh is in the record? Yes, Bayh is on page A44. A44. A44. Go ahead, I'm sorry, you can go ahead. And when you look at Bayh, and they read that, the result of Bayh was, what was the conclusion of their study? The conclusion was, treat the rhinitis with either decongestant alone, or treat it with sedation of a sedating stimulant, a sedating inhiostomy, and a decongestant. And then they went on and said, geez, we also asked them about these unwanted effects, and what they found was that the patients themselves, when were asked about that, if they perceived that they were helped, and this included not only people taking decongestant, the combination, and placebos, they had very, very few complaints. But the ones who didn't think they were helped, even if they were taking those medications, they complained of unwanted effects. And so, there's no rationale to determine, well, what's really the issue here going on? Because the patients themselves don't know what's going on. It could be they can't get to sleep at night. What's the reason for not being able to sleep at night? Oftentimes, it's the cold, it's the sickness that keeps you up. The sedation hopefully puts you to sleep, but there's very little in by that rings out and says, well, look at that decongestant. That's an issue. When you look at all of this prior art, this goes back to 1980. 1980 all the way to 2003, it was still the belief of those in the field that the combination of a decongestant and a sedating antihistamine was sedating. And the reason they were always looking at the sedating antihistamine, because that was the big problem. Ergo, the reason they came out with the non-sedating antihistamines, which now has very little or no sedating effect. And if that were the case, well then, I would agree with you. That might be a reason why you'd want to reduce the decongestant at night. But this isn't that case. This case is a combination of a sedating antihistamine and a stimulating decongestant. And the difference is that we are reducing the decongestant at night only because the inventors discovered in their own practice that they couldn't pinpoint why patients were actually complaining. Thinking it was maybe just the cold symptoms that was giving them the problem. And so they started now looking at reducing the decongestant and seeing if that had an effect. But all of the prior art, keeping in mind that the primary reference that the examiner used was Nutsen in one rejection and Waltney in the second rejection. Both of those treat their patients with the same amount of decongestant day and night. Okay. The only reference that they hang their hat on is the antihistamine portion of the textbook from Goodin and Gilman, which is dealing with the antihistamine, not the decongestants. And the reason is because those in the art didn't see decongestants as a problem when combined with a sedating antihistamine. I believe this is a classic case of using hindsight reconstruction to pick and choose among these isolated disclosures in the prior art to try to deprecate the claimed invention. They can never point to any piece of prior art that ever suggests reducing the dosage of the decongestant at night. The question is whether to one skill in the art it would have been obvious to reduce the dosage. Taking the prior art would have been obvious to one skill in the art to have reduced the dosage of the antihistamines, or rather the decongestants. You only arrive at that if you ignore the then accepted wisdom in the field at that time of the invention. If you ignore that, then yes. The accepted wisdom at the time of the invention is that decongestants are stimulants and antihistamines are sedatives. But not for combinations. Combinations had no effect. Again, I can't overemphasize the fact that we're dealing with a combination. We're dealing with a combination of a stimulating decongestant with a sedating antihistamine. If you're giving medications to patients and it's a combined decongestant and antihistamine and they're having problems sleeping, it's not obvious to one in the art that if you reduce the decongestants that maybe they'll be able to sleep better? No, it's not obvious because the thinking was it's the symptoms of the disease that's giving the insomnia. They can't sleep. They're having problems. And the reason they were thinking that way is because the combination was considered a sedating combination. That if we give you this combination, it's going to make you sleepy. That's what the prior art always says. That this is a combination that is sedating. And no one ever tried to reduce the decongestant because that was an issue. It was always. You have a combination that's sedating, but people are still having trouble sleeping. But the people of skill in the art knew which of the two were the sedating part. Nobody was under the belief that, I can't even get which one is which, right? But no one was of the belief that the one that was a stimulant was really causing you to sleep, right? Everybody understood it was the combination that made it sedating. Which one's the sedating one? Help me. Antihistamine. Okay. No one was of the belief that decongestants were sedating, right? Correct. Okay. So everybody knew the antihistamines were the sedating component. Correct. Okay. So if everyone knows here's the combination, part of which is sedating, part of which is stimulating, and people are still having trouble sleeping, they're not having trouble sleeping because of the cold system. Maybe. Maybe it has nothing to do with the antihistamine. But for goodness sakes, give them more of the sleepy drugs. Why isn't that obvious? Who cares why they're having trouble sleeping? One drug makes you sleep. One drug keeps you awake. Give them more of the sleepy one. Well, you can't give them more of the sleepy one because there are set dosage levels that you can give. And you're not allowed to go beyond that. And so... No, here the plan is you give them less. You give them less of the stimulant, not more. But there's no way to know that that's what's keeping them awake. See, for all of this time... Who cares what's keeping them awake? Just give them... You know, if you know they're staying awake, just go like this. One is a wakey-wakey, one is a sleepy-sleepy. Just go like this with them. But no one's ever done that. No one's ever... Are you kidding? I give my kids more Benadryl all the time. Let's not go there. Go to sleep already. I'm just kidding. I'm kidding. And she was killed in the yard. I'm the old school. Brandy, when you're teething, no problem. Again, it's... They're not going to rely on it to make their case. They're relying on prior art that doesn't suggest that. I think we ought to hear from the government. We've exhausted your time. I'll give you about two minutes. Thank you. Thank you, Your Honor. May I please report? A big problem with the claim is that it is so close to the prior art that in Nudsen, the decongestant dosages stay the same, 25 milligram, that's on page 56 of the record. And as I think a couple of Your Honors alluded to, because of known problems with decongestants, you can lower the dosage. And even if you lower one milligram, just slightly lower the decongestant dosage, that runs into the claim. So the problem is the claim has such a wide range that Nudsen is just above the range of the claim because all the claim says is attenuated dosage. And we knew that decongestants cause insomnia, and we also knew from many references that it was well known in this art to adjust dosages to reduce side effects. So just tipping the dosage a little bit, and there could be other reasons why you would tip the dosage. If someone has a problem with an antihistamine and you have to lower that, well, to not be awake at night, you would also lower the decongestant. Then you run into the claim. So the claim is a problem because it has such a wide range, bookended by the prior art. Nudsen is just above the range, and another reference, Middleton, with zero decongestant at night, is abutting the range from the bottom. So the reference is set for... But the problem is, would it have been obvious to want to steal any art to do it? I mean, who cares how close they are together if it wouldn't have been obvious? Well, it would have been obvious, Your Honor. And the office has substantial evidence that decongestants back at this time were well known to... And it's not just Goodman. There's another reference. There's... It's not just by... It's the Weinstein reference, an earlier patent issued to the same inventor. But none of those were, as I understand your opponent's argument, none of those were combinations of antihistamines and decongestants. So his statement is that one of Skilniar absolutely knew once this combination was put together, it was a sedative combination on its own. Well, Your Honor, with insomnia and adjusting dosages, and this court's case law on trying to, quote-unquote, lock up a range, that if you're trying, you should at least have to show criticality and submit evidence in response to the two strong prima facie cases of obviousness here. The references show decongestants causing insomnia and adjusting dosages were well known in the prior art. When you put all that together, it would be obvious, and as this court has held in cases like Inwood, Woodruff, and Geisler, that to try to go down a range and lock up a whole range, you should have to show criticality, and that's what the board was saying, was that there was not rebuttal evidence to show that something unexpected was happening here. This is totally expected, and under KSR, it's using known features, adjusting dosages, to address side effects, and the knowledge that decongestants cause insomnia to perform a predictable result. The predictable result is less sleepiness, and there could be other reasons that if you had to reduce the antihistamine, you couldn't put as much decongestant in there. So the problem is, we think, the breadth of the claim, it has such a wide range, and it's such a slight decrease from the prior art to make the claimed invention, and that sets forth the board's and examiner's prima facie case of obviousness, and the evidence is throughout the references as substantial for those two principal teachings, adjusting dosages and decongestants cause insomnia, and at least shifted the burden back to the applicant to come back with some maybe unexpected results, evidence, something to respond to the prima facie case for this wide range in the claim. Maybe he has something there for a smaller range with evidence of criticality, but here he really, with the claim language, has tried to lock up the whole range from nuts and on down to zero without any rebuttal evidence. Yes, exactly, Your Honor, and that's not been disputed as the board discussed it. It only means lower than an applicant has been on board with that all along. So going from 25 milligrams in nuts and to 24.5 milligrams or anything like that is an attenuated dose, and that is what this claim is covering, any decrease in decongestant from the daytime dosage, and that's the biggest problem here and why the prima facie case is sound. There are two obviousness prima facie cases here that applicant has not rebutted with any unexpected results. There was an anticipation issue in this case, wasn't there? There used to be. The board reversed that. Are you arguing more anticipation than obviousness? No, Your Honor, because of cases like Woodruff and Geisler, when you try to lock up a range, there's good reason to think that it would be expected. So if it was so obvious then, Knudsen was issued in what, 1980? Yes, Your Honor. So we have 23 years that intervened and no one figured out this balancing the dosages? Well, it's not anticipated, but the references together, and Knudsen issued in 1981, the references together show substantial evidence that people had this knowledge in the art that decongestants cause insomnia and reducing dosages reduce side effects. So that's why it's an obviousness rejection, Your Honor. Your Honor might have been thinking, and it's exactly correct, that the board reversed the anticipation rejections and said that these references, maybe they're open-ended, but they don't teach all the limitations. You have to combine, and here, the board and the examiner combined several references, I think there are about eight total, to set forth the two prima facie obviousness rejections and shifting the burden to the applicant to come back with some type of rebuttal evidence, which applicant did not do. If the court has no further questions, I'll take my seat. Thank you, Your Honors. Hello? Am I saying it right again? Oh, good. Thank you. Two issues I just want to bring up. You mentioned the Weinstein reference, and I'd like to point out to the court that in that Weinstein reference, a portion of that reference that the board and the examiner was relying on was a statement about reducing decongestant to avert the stimulating effect. However, that section came out of the second regimen in Weinstein reference, and that second regimen has no sedating antihistamine. Only the first regimen had that, and in that first regimen, they had decongestant, same amount, day and night, and what they did is they reduced the amount of the sedating antihistamine during the day. Why? Because the nighttime, they used this 50 milligrams of diphenylhydramine. That's the normal adult dose. That's verified in Goodman on page 842 in the table. That's the normal dosage. So in the Weinstein reference, they reduced that during the day. Why? To offset with the decongestant, to offset the sedation aspect of it. Again, there was no concern with the stimulating effect at night. The second thing is he mentions about KSR and a known problem. Well, the known problem was the sedating effect of the antihistamine. There was no known problem of the combination being stimulating. It was sedating. So I don't know where that known problem comes in, and in terms of all of the references, there's not one reference in all of this time period that even considers taking a combination dosage and reducing the amount of decongestant at night. They've always kept the same amount of decongestant or just did away with it completely. Why? Because they wanted to take advantage of the sedating effect only. Give a final thought. Again, my only final thought is that I think this is a classic case of hindsight reconstruction, where they're taking portions out of an isolated references in the prior art to try to make the case for a prima facie obviousness, and we think they failed. Thank both counsel for their argument. The case is taken under submission.